DOWNRIVER PLAZA GROUP v SOUTHGATE

Docket No. 95019. Argued October 7, 1993 (Calendar No. 11). Decided
March 22, 1994. Rehearing denied 445 Mich 1203.

Downriver Plaza Group and Lewis George, as personal represen-
tative of the estate of Nicholas George, deceased, brought a
class action in the Wayne Circuit Court against the City of
Southgate, alleging that charges assessed on their 1987 and
1988 tax bills for the costs of operation and maintenance of the
Southgate-Wyandotte Drainage District were illegal, and seek-
ing recovery of monies paid. The court, Marianne O. Battani,
J., although initially finding the assessments to be invalid
because they violated provisions of the city's charter, subse-
quently entered a judgment of no cause of action for the city,
finding that the city council's 1990 resolution reaffirming the
user charge system effectively cured the violation. The Court of
Appeals, NEFF, P.J., and GRIBBS and MURPHY, JJ., reversed in
an opinion per curiam, finding that retroactive application of
the 1990 resolution violated due process and ordered a refund
of the monies collected for the 1987 and 1988 assessments
(Docket No. 129708). The city appeals.

In an opinion by Chief Justice CAVANAGH, joined by Justices
BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, the Supreme
Court held:

The city had the legal authority to assess user fees in fiscal
years 1987-91; the retroactive validation of previously collected
fees is consistent with the requirements of due process.

1. The city had the authority to levy user fees in 1987 and
thereafter under the Drain Code and its council's 1975 resolu-
tion. While the implementation of the user charge system was
initially deficient, the 1990 resolution, which was justified,
satisfactorily corrected the defect. Thus, the assessments for
1987-91 are valid.

2. The retroactive validation was consistent with due process;
its features serve a legitimate purpose that is achieved by
rational means. The plaintiffs had been aware of the new drain
system because of the ad valorem taxes they had to pay to help
meet the drain's construction costs. More importantly, the 1975
resolution gave them direct notice that the city would impose
charges on users. While their liability was deferred between
1980 and 1987, they did not have a right to have the deferral
continue. At no time did the city represent that the services

would be gratuitous. Thus, the 1990 retroactive validation did not abrogate any vested rights.

Reversed.

Justice LEVIN, dissenting, stated that because § 490 of the Drain Code does not authorize the levying of the service charges, the charges levied for the operation and maintenance of the Southgate-Wyandotte drainage district should be refunded to the plaintiffs.

In the absence of a saving clause, an act amending a specific section of a former act strikes the former section from the law, obliterating it entirely and substituting the new section in its place. Thus, when the city first attempted to levy a service charge respecting the intracounty drain, its power to do so under § 490 was subject to § 489a. 1979 PA 135 is remedial legislation. There is no more reason to suppose that the Legislature intended prospective effect than retrospective effect. It is immaterial that in 1988 the city was unable to comply with the prerequisites of § 489a to the exercise of the power to establish service charges set forth in § 490. The power to establish service charges, except subject to the strictures set forth in § 489a, ceased to exist, in March, 1980, when former § 490 was obliterated in its entirety, and the new language took its place.

195 Mich App 192; 489 NW2d 178 (1992) reversed.

*Fried & Levitt, P.C.* (by *David M. Fried* and *Dennis Watson*), for the plaintiffs.

*John F. Gilhool* for the defendant.

Amicus Curiae:

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *John M. Donohue*) for Michigan Municipal League.

CAVANAGH, C.J. Plaintiffs, property owners in the City of Southgate, filed this action against Southgate because the city placed a charge for the operation and maintenance costs of the Southgate-Wyandotte Drainage District (SWDD) on their 1987 and 1988 tax bills. Plaintiffs allege that the charges were illegal, and seek recovery of monies paid. The trial court ruled that the fees were valid, and denied recovery. The Court of Appeals re-

versed,[1] and ordered Southgate to refund an estimated $1.7 million in collected fees. We granted
leave in this case to resolve the following issues:
(1) whether Southgate had lawful authority to
assess the fees for fiscal years 1987-91, and (2) if
so, did retroactive validation of fees assessed in
fiscal years 1987-88 violate the plaintiffs' rights to
due process?

We hold that (1) Southgate was legally permitted to assess user fees in fiscal years 1987-91, and
(2) the retroactive validation of previously collected fees is consistent with the requirements of
due process.[2]

### I. FACTUAL AND PROCEDURAL HISTORY

In 1975, Southgate, through Wayne County, received a $40,793,250 federal grant to construct a
flood and pollution control plan that would operate
in the SWDD. The SWDD services sixty percent of
the population of Southgate. The federal government made the grant pursuant to the federal
Water Pollution Control Act amendments of 1972.[3]

The federal statute, and its accompanying regulations,[4] required grant recipients to adopt "a system of charges" so as to assure that users of the
improved drains would pay a proportionate share
of the operating and maintenance costs for the
drains.[5] To that end, on April 17, 1975, the Southgate City Council passed a resolution in which it
expressly adopted, and agreed to implement "a
system of User Charges."

---

[1] 195 Mich App 192; 489 NW2d 178 (1992).

[2] Because of the disposition we make in favor of the defendant on
these grounds, we do not find it necessary to address the other issue
raised in its brief.

[3] 33 USC 1251. Subchapter II specifically deals with construction
grants. See 33 USC 1281.

[4] 40 CFR 35.

[5] 33 USC 1284.

In 1976, Southgate levied a general ad valorem tax to help finance the construction of the new drainage system. By 1980, construction was complete, and the drains were ready for use.

Between 1980-87, the Wayne County Drainage Board (WCDB) assessed operation and maintenance costs against Southgate. However, the WCDB did not bill Southgate directly for these costs because the Wayne County Drainage Commissioner had unilaterally decided to apply excess construction funds to the initial charges. By 1988, this surplus had been depleted, and on March 17, 1988, the WCDB sent Southgate its first bill for operation and maintenance costs.

In response, the Southgate City Council planned a special public hearing for April 13, 1988, to discuss implementation of the user charge system that it had previously approved in 1975. The Southgate City Council published notice of the meeting in the city newspaper on April 3, 1988, and April 6, 1988.

On April 13, 1988, participants at the meeting discussed the user charge system and, in particular, the mathematical formula used to calculate individual user charges.[6] Because less than a full Southgate City Council was present, the participants did not pass a resolution to implement the user charge system. Instead, the Southgate City Council tabled the user charge item until the next scheduled city council meeting.

---

[6] The individual user charge formula for the drains is based on established "runoff-coefficients" assigned to each category of property (i.e., churches, residences, schools, etc.). The actual acreage per parcel is multiplied by the runoff coefficient to yield the impervious acreage per parcel. The total impervious acreage in the Southgate portion of the SWDD is then multiplied by Southgate's share of annual operation and maintenance costs for the SWDD. The product of these two factors is the unit cost per impervious acre. As the final step in the calculation, the unit cost per impervious acre is multiplied by the impervious acreage of each Southgate parcel. The result is the annual fee charged to each Southgate parcel in the SWDD.

On April 27, 1988, the Southgate City Council met, and this time passed a resolution regarding user charges. The resolution resolved, among other things, that user charges would be levied on the next tax roll.

Plaintiffs, users of the drains, were assessed charges on their 1987 and 1988 tax bills. While plaintiffs paid the assessments, they subsequently claimed that the fees were invalid. Thereafter, plaintiffs filed suit in the Wayne Circuit Court, demanding a refund of monies paid.

On July 28, 1989, the trial judge granted the plaintiffs' partial summary disposition, finding that Southgate had violated its charter when it collected user charges for 1987 and 1988. Specifically, the Southgate City Council had failed to incorporate the rate for user charges into the relevant resolutions, contrary to charter requirements. On the basis of this error, the trial judge concluded that the 1987 and 1988 assessments were invalid.

On August 30, 1989, the Southgate City Council passed a resolution adopting "the individual user charge formula as presented initially at the public hearing on April 13, 1988 . . . ." The Southgate City Council then scheduled another hearing for January 3, 1990, in order to discuss assessed fees with the public.

On January 3, 1990, the Southgate City Council passed its final resolution regarding the user charge system. This resolution effectively validated all prior resolutions, and affirmed or reaffirmed user charges for fiscal years 1987-91.

On April 19, 1990, the trial judge entered a judgment of no cause of action in favor of Southgate, and against the plaintiffs. The trial judge found that the January 3, 1990, resolution sufficiently cured the previous charter violation. The

trial court concluded that the January 3, 1990, resolution had retroactive effect from December 1, 1987.

The Court of Appeals reversed this decision, ruling that retroactive application of the January 3, 1990, resolution would violate the plaintiffs' rights under due process. The Court ordered Southgate to refund monies paid for the 1987 and 1988 assessments.[7]

On June 23, 1993, this Court granted leave.[8]

## II. VALIDITY OF THE USER CHARGES

The plaintiffs claim that the assessments on their 1987 and 1988 tax bills are invalid. We disagree. Southgate had the authority to levy user fees in 1987 and thereafter, and, while the implementation of the user charge system was initially deficient, the 1990 resolution satisfactorily corrected the defect. Moreover, this Court finds that the retroactive application of the 1990 resolution is justified. Thus, we reverse the Court of Appeals decision, and hold that the assessments for years 1987-91 are valid.

### A. AUTHORITY TO ASSESS USER CHARGES

Michigan's Drain Code enabled Southgate to legally assess user charges. The Drain Code is the comprehensive authority for drain systems operating in Michigan. As explained in *Toth v Waterford Twp,* 87 Mich App 173, 176; 274 NW2d 7 (1978),

The statute represents the Legislature's attempt

[7] The Court of Appeals did not specifically invalidate the 1989 assessments. Rather, it remanded to the trial court for a finding as to whether the August 30, 1989, resolution properly implemented a user charge.

[8] 442 Mich 929.

to codify all laws regarding drains and to provide
for detailed, specific and exclusive procedures to be
followed in proceedings to construct and maintain
drains. . . . Absent fraud, all matters pertaining
to the locating, constructing, cleaning, extending,
etc., of drains are to be determined according to
the procedures set forth in the Drain Code.

The SWDD is an intracounty drain system governed
by chapter 20 of the Drain Code. Section 490 of
chapter 20 unreservedly authorizes public corpora-
tions, such as Southgate, to collect "service
charges" from property owners who utilize public
drains.

In place of or in addition to levying special
assessments, the public corporation, under the
same conditions and for the same purpose, may
exact connection, readiness to serve, availability,
or *service charges* to be paid by owners of land
directly or indirectly connected with the drain
project, or a combination of projects . . . . [MCL
280.490(4); MSA 11.1490(4).]

The plaintiffs argue that Southgate lacked the
authority to assess user fees in 1988 because, by
that time, the drain project had already been
completed. Plaintiffs rely upon § 489a to support
this assertion. Section 489a sets forth various pre-
requisites regarding assessments that must be fol-
lowed before the construction of a drain project.[9]
Plaintiffs contend that none of these requirements

[9] In pertinent part, § 489a requires that the legislative body of a
public corporation:

(c) Forward by first-class mail to each person whose name
and address appears on the tax rolls as owning land within the
proposed district, at the address shown on the last tax assess-
ment roll of the public corporation, a notice which contains all
of the following:

(i) A general description of the *proposed* drain project.

(ii) Expected benefits of the *proposed* drain project.

were met by 1988, and, therefore, any attempt to assess in 1988, or thereafter, violates the Drain Code.

The plaintiffs' reliance upon § 489a in this context is improper. Section 489a amended § 490, and went into effect in 1980. By 1980, the construction of Southgate's new drain system was finished. Consequently, it would not have been possible for Southgate to ever have complied with § 489a's requirements. Clearly, the Legislature intended that § 489a would have only prospective effect. Thus, we agree with the trial judge's conclusion that 489a is "without meaning in this case." Further, we conclude that Southgate had valid authority to levy user fees under the appropriate Drain Code sections.

In addition, the Southgate City Council's own resolution, passed unanimously in 1975, empowered Southgate to collect user charges. In effect, the resolution *obligated* Southgate to make users pay the operation and maintenance costs for the new drain system.

On these bases, this Court holds that Southgate had the legal authority to assess user charges in 1987 and thereafter.

---

(iii) Notice that the *proposed* project is to be fully or partly financed by special assessment against property owners within the proposed district.

(iv) A statement that alternative plans of financing the *proposed* project will be on the meeting agenda.

(v) Notice of the time, date, and place of a meeting to be held by the legislative body of the public corporation to hear objections to the *proposed* drain project or special assessment, fee, or charge to be levied under this section. Notice prescribed by this subparagraph shall be mailed not less than 10 days before the meeting, and in addition, shall be given the manner prescribed by Act No. 267 of the Public Acts of 1976, as amended, being sections 15.261 to 15.275 of the Michigan Compiled Laws, and shall be published in a newspaper of general circulation in the public corporation. [MCL 280.489a(c); MSA 11.1489(1)(c).]

### B. RETROACTIVE VALIDATION OF THE 1987-88 USER CHARGES

While finding that Southgate was legally permitted to assess user charges, we also recognize that implementation of the user charge system was originally flawed. Section 162 of the Southgate City Charter provides that when rates are established, the "Council shall fix such rates and charges by resolution." This provision thus required the Southgate City Council to explicitly set forth the individual user rates in one of its resolutions. Undoubtedly, the Southgate City Council attempted in good faith to comply with § 162's direction. Nonetheless, the efforts technically fell short because the individual formula, while repeatedly discussed, was never expressly incorporated into a resolution. For this reason, the trial court was forced to find the 1987-88 assessments to be invalid.

However, Southgate subsequently took comprehensive steps to remedy the procedural oversight.

On August 30, 1989, a little over a month after the trial judge's decision, Southgate unanimously passed a resolution that (1) incorporated the precise individual user charge formula, (2) directed interested persons to review the formula at the Office of the City Clerk, and (3) directed persons aggrieved by the formula to file a complaint with city officials within twenty-eight days. The Southgate City Council also attached a copy of the user formula to the resolution.

The Southgate City Council also notified property owners of another public meeting scheduled for January 3, 1990, in order to discuss assessed user charges. While not required under the Drain Code to do so, the Southgate City Council advertised the meeting by providing the estimated eight

thousand property owners with individual notices through first class mail. The Southgate City Council also caused a notice to be published in the local newspaper, which stated that the formula was available for review at the Southgate Finance Department. Further, the notice indicated that those wishing to protest the charge could do so by either (1) appearing at the meeting, or (2) mailing a letter to the Southgate Finance Department.

Lastly, the Southgate City Council unanimously passed the final resolution regarding the user charge system at the January 3, 1990, hearing. The resolution reaffirmed the substance of all prior related resolutions. In particular, the resolution (1) readopted the individual user charge formula, (2) affirmed or reaffirmed that aggrieved users had twenty-eight days within the annual adoption of the user charge to file a grievance with city officials, and (3) reaffirmed the operation and maintenance costs for the SWDD for fiscal years 1987-91.

Despite Southgate's extensive efforts to cure the charter violation, the Court of Appeals ruled that retroactive application of the January 3, 1990, resolution would violate the plaintiffs' rights under due process. To reach this conclusion, the Court of Appeals relied exclusively upon *Metro Homes v City of Warren,* 19 Mich App 664; 173 NW2d 230 (1969), cert den 398 US 959 (1970). We find this reliance improper because the *Metro Homes* pronouncements regarding due process limits on retroactivity are outdated. The appropriate focus rests with this Court's recent analysis of the retroactivity issue set forth in *Romein v General Motors,* 436 Mich 515; 462 NW2d 555 (1990), and the United States Supreme Court's subsequent affirmance of that analysis in *General Motors Corp v Romein,* 503 US —; 112 S Ct 1105; 117 L Ed 328

(1992). On the basis of this precedent, we hold that retroactive operation of the January 3, 1990, resolution is consistent with the Due Process Clauses of the Michigan and United States Constitutions.

We begin our analysis of plaintiffs' due process claim with mention of the applicable standard of review. We construe the Southgate City Council's January 3, 1990, resolution to be an economic legislative measure. When scrutinizing economic and social legislation, this Court applies the rational basis standard of review.[10] Applying this standard, the resolution "'come[s] to the Court with a presumption of constitutionality,'" and "the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Romein,* 436 Mich 525, quoting *Pension Benefit Guaranty Corp v R A Gray & Co,* 467 US 717, 730; 104 S Ct 2709; 81 L Ed 2d 601 (1984).

Our specific concern in this case lies with the retroactive components of the January 3, 1990, resolution. As explained by the United States Supreme Court, retroactivity invokes special considerations:

> Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions. [*Romein,* 112 S Ct 1112.]

The Court has also advanced that what may be a justification for prospective legislation, may not suffice for retroactive legislation.[11]

While cognizant of the unique concerns associ-

[10] *Romein,* 436 Mich 525.

[11] *Usery v Turner Elkhorn Mining Co,* 428 US 1, 16-17; 96 S Ct 2882; 49 L Ed 2d 752 (1976).

ated with retroactivity, we recognized in *Romein* that the same standard of review is employed regardless of whether the economic legislation has prospective or retroactive effect:

> The rational relationship test applies to economic legislation whether it is retroactive or not. The retroactive aspects of legislation must meet the test of due process, "but that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." [*Romein,* 436 Mich 528, quoting *Pension Benefit Guaranty, supra* at 730.]

In affirming our decision in *Romein,* the United States Supreme Court articulated the due process test for retroactivity as follows: "a legitimate legislative purpose furthered by rational means." *Romein,* 112 S Ct 1112.

Applying the requisite test, this Court finds that the retroactive features of the January 3, 1990, resolution serve a legitimate purpose. Retroactive validation of the 1987-88 user charges enable Southgate to impose operation and maintenance costs for the much needed and improved drain system, and only upon those that directly benefit from that system—the drain users. Significantly, when the plaintiffs challenge the retroactive application, they do not specifically argue that the costs are unreasonable in amount—they simply do not want to pay for their use of the drains.

When a court evaluates whether retroactive operation promotes a sound objective, it must specifically consider the extent of the parties' reliance:

> The justification for retrospective legislation must take into account the possibilities that the parties acted in reliance on current law and that

they may have altered their conduct to reduce liability if they had anticipated the imposition of later liability. [*Romein,* 436 Mich 527.]

While plaintiffs do not point to a specific law, they do contend that they relied on the fact that they did not have to pay user fees in 1980-87. They urge that they developed an expectation that Southgate would not charge them for using the drains. This Court acknowledges that the plaintiffs may have relied as they describe because of the situation that resulted when the County Drain Commissioner applied surplus ad valorem construction funds to starting-operation and maintenance costs. However, we are not persuaded by the plaintiffs' belated assertion that they would have relocated within Southgate had they known that they would eventually have to pay user charges.

The SWDD provides service for sixty percent of the population in Southgate. Before 1975, the flooding and pollution within the SWDD had escalated to immense proportions—so much so that the federal government found it necessary to extend a $40 million grant in an effort to remedy the problem. Since 1980, the enhanced drainage system has provided users with health and economic benefits and has operated as an effective solution to an obstacle that was both widespread and serious. In light of the beneficial service that the drain system provides, we are not convinced that the plaintiffs would have considered actually moving outside of the SWDD simply to avoid paying user charges for the service.

This Court also finds that the January 3, 1990, resolution is a rational means of achieving the city's legitimate objective. The form of retroactivity should not produce arbitrary or unreasonable

results.[12] In *Romein,* this Court explained that "[t]o determine if the retroactivity is arbitrary or unreasonable, the party's reliance on the preexisting state of the law should be considered." 436 Mich 530. We conclude that the plaintiffs' inferences, derived from their reliance on the absence of direct charges between 1980-87, were not justifiable.

Since 1975, the plaintiffs had been aware of the new drain system on the basis of the ad valorem taxes that they had paid to help meet the drains' construction costs. More importantly, by virtue of the 1975 resolution, the plaintiffs had been given direct notice that Southgate would impose charges on users. At no time did Southgate represent that drain service would be gratuitous. Hence, the plaintiffs' conclusion that they would never be charged for drain usage was unreasonable.

"This Court has held that a remedial statute which acts retroactively does not violate due process so long as it does not impair vested rights." *Romein,* 436 Mich 531. Plaintiffs' reliance did not give rise to a vested right. The plaintiffs may have hoped that they would never be charged for drain usage. However, their obligation to pay user fees had been in place since 1975. While the plaintiffs' direct liability was deferred between 1980 and 1987, the plaintiffs did not possess a vested right to have that deferral continue. But for the charter violation, Southgate's collection of fees would have been proper in 1987, and would not have infringed on any legitimate rights of the plaintiffs. Similarly, when, on January 3, 1990, Southgate retroactively validated collected fees for 1987-89, it did not abrogate any vested rights belonging to the plaintiffs.

---

[12] *Romein,* 436 Mich 530.

To underscore that retroactivity in this case is a rational means, we note the inequities that would result if the January 3, 1990, resolution was given only prospective effect. Southgate would have to refund approximately $1.7 million in collected user fees. Southgate no longer has this money in its accounts because, upon collection, it promptly turned the fees over to Wayne County. As a result, Southgate's general taxpayers would have to provide money for the plaintiffs' refunds. These same taxpayers have already underwritten the bill for operation and maintenance costs accruing in 1980-87 when their ad valorem taxes were applied to initial fees. Taxpayers who have no access to the drain system would again be forced to pay for a service from which they derive no direct benefit. The only way that this unfairness can be avoided is to retroactively validate the 1987-89 user charges.

This Court concludes that retroactive application of the January 3, 1990, resolution represents a rational means to a legitimate purpose, and, thus, is consistent with due process. Accordingly, we reverse the Court of Appeals decision.

### III. CONCLUSION

We hold that Southgate had the legal authority to assess the plaintiffs user fees. We also find that retroactive application of the January 3, 1990, resolution, curing a procedural irregularity regarding prior charges, comports with notions of due process.

Accordingly, we reverse the decision of the Court of Appeals.

BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred with CAVANAGH, C.J.

LEVIN, J. (*dissenting*). The plaintiffs, Downriver

Plaza Group and Lewis George, property owners in the City of Southgate, commenced this action against the city seeking a refund of user charges levied for the operation and maintenance of the Southgate-Wyandotte drainage district, an "intracounty" drain.

The city contends that § 490 of the Drain Code[1] authorizes the levy of the user charges. Section 490 provides for levying of "service charges to be paid by owners of land directly or indirectly connected" with an intracounty drain. Plaintiffs challenge the validity of the levy on a number of grounds.[2] Because I conclude that § 490 does not authorize levying of the service charges, I would affirm the decision of the Court of Appeals, which ruled in part for the plaintiffs,[3] and would order a refund to the plaintiffs.

I

Section 490 is found in chapter 20 (intracounty drains) of the Drain Code.[4] Section 490 provides for levying of special assessments against land especially benefited by the construction of an intracounty drain, and for levying of service charges, in place of or in addition to special assessments, to be paid by owners of land directly or indirectly connected to the drain.

A

Intracounty drains may be located, established and constructed when "necessary for the public

[1] MCL 280.490; MSA 11.1490.

[2] The disposition that I would order makes it unnecessary to address other arguments and claims advanced by the plaintiffs.

[3] 195 Mich App 192; 489 NW2d 178 (1992).

[4] Chapter 21 (MCL 280.511 et seq.; MSA 11.1511 et seq.) concerns intercounty drains and contains similar language. Sections 538a (MCL 280.538a; MSA 11.1538[1]) and 539 (MCL 280.539; MSA 11.1539) correspond to § 489a and § 490.

health"[5] on the petition of "2 or more public corporations which will be subject to assessments to pay the cost" thereof.[6] A county drainage board assesses the public corporations for the costs of construction and for operation and maintenance.[7]

When first enacted, the Drain Code did not provide for levying of either special assessments or service charges, and, thus, all costs respecting intracounty drains were then funded through ad valorem or other taxation.

The Drain Code was amended by 1957 PA 38 to add § 490, which authorizes a public corporation, such as the City of Southgate, assessed under chapter 20 for an intracounty drain, to levy special assessments against "especially benefited lands, provided such special assessment method of financing is not inconsistent with local financing policy as to similar drains and sewers." It was further provided that in lieu of levying special assessments, a public corporation "may exact *connection* charges to be paid by owners of land directly or indirectly connected with the drain project." (Emphasis added.)

Section 490 was amended by 1965 PA 253 to provide that in "lieu of or in addition to levying special assessments, the public corporation under the same conditions and for the same purpose may exact connection, readiness to serve, availability or *service charges* to be paid by owners of land directly or indirectly connected with the drain project, or any combination thereof." (Emphasis added.)

B

It appears that a federal grant of over forty

---

[5] MCL 280.462; MSA 11.1462.

[6] MCL 280.463; MSA 11.1463.

[7] MCL 280.473 *et seq.*; MSA 11.1473 *et seq.*

million dollars was provided in 1975 and subsequent years to construct this intracounty drain. In 1976, Southgate levied an ad valorem tax to provide funds therefor. Because, upon completion of the drain in 1980, there were excess funds, it was not until 1988, some seven or eight years after completion of the drain, that Southgate received its first bill from the drainage district for operation and maintenance costs.

The federal statute, pursuant to which the funds were provided, required recipients to adopt "a system of charges,"[8] and, in this connection, the Southgate City Council, in 1975, resolved to implement "a system of User Charges," but nothing further was done to actually levy user charges until after the receipt in 1988 of the first bill for operation and maintenance costs.

C

In 1980, the same year construction of the drain was completed, § 489a[9] was added to the Drain Code and § 490 was amended by 1979 PA 135, effective March 27, 1980. As amended, the authority of a public corporation, assessed by a drainage district, to levy special assessments and service charges, was subjected to the requirements of § 489a.[10] The pertinent language of § 490, relied on by the city as the authority for levying the service charges in issue, now reads:

This section shall not be construed to prevent

---

[8] 33 USC 1284.

[9] MCL 280.489a; MSA 11.1489(1).

[10] There are six references to § 489a in the current version of § 490. The Legislature has made it abundantly clear that the authority granted by § 490 is circumscribed by the provisions of § 489a.

the assessment of public corporations at large under this chapter. In place of or in addition to levying special assessments, the public corporation, under the same conditions and for the same purpose, may exact connection, readiness to serve, availability, or service charges to be paid by owners of land directly or indirectly connected with the drain project, or a combination of projects, *subject to section 489a.* [MCL 280.490(4); MSA 11.1490(4). Emphasis added.]

Section 489a provides that if a public corporation determines that a part of the land will be especially benefited by a "proposed drain project so that a special assessment, fee, or charge may be levied" under § 490, the city shall, before petitioning for an intracounty drain, forward to each person owning land in the drainage district, a general description of the proposed drain project, the expected benefits of the project, notice that the project is to be fully or partly financed by special assessment against property owners within the district, and a statement that alternative plans of financing the proposed project will be considered at a meeting of the governing body of the public corporation.

Section 489a further provides that before actually filing a petition to constitute a drainage district, the legislative body may decide to proceed with the project and levy a special assessment, fee, or charge, or to proceed without levying a special assessment, fee, or charge, or to reject or withdraw from the proposed drain project. Persons aggrieved may appeal by instituting an action in the circuit court.[11]

II

The majority holds that plaintiffs' reliance on

---

[11] MCL 280.489a; MSA 11.1489(1).

§ 489a is improper because the construction of the drain was completed before § 489a became effective. The majority concludes that the "Legislature intended that § 489a would have only prospective effect":

> Consequently, it would not have been possible for Southgate to ever have complied with § 489a's requirements. Clearly, the Legislature intended that § 489a would have only prospective effect. Thus, we agree with the trial judge's conclusion that 489a is "without meaning in this case." Further, we conclude that Southgate had valid authority to levy user fees under the appropriate Drain Code sections.[12]

The majority ignores plaintiffs' argument that, in the absence of a saving clause, an act amending a specific section of a former act strikes the former section from the law, obliterating it entirely and substituting the new section in its place.[13] One of this Court's recent pronouncements is *Ballog v Knight Newspapers, Inc,* 381 Mich 527; 164 NW2d 19 (1969), in which this Court, reversing a decision of the Court of Appeals, held that an amendment of a provision of the Revised Judicature Act concerning interest on a judgment should be given retrospective effect to all actions accrued, pending, and future. As set forth in the headnotes, this Court ruled:

> An amendatory act has a repealing force, by the mechanics of legislation, different from that of an independent statute, repugnancy not being an es-

---

[12] *Ante,* p 663.

[13] The plaintiffs cite *Priest v Canada Life Assurance Co,* 179 Mich App 731, 736-737; 446 NW2d 352 (1989), quoting from *Lahti v Fosterling,* 357 Mich 578, 588-589; 99 NW2d 490 (1959), and *People v Lowell,* 250 Mich 349, 354-356; 230 NW 202 (1930).

sential element of the implied repeal of specifically amended sections.

\* \* \*

*The original or older form of a section of a statute ceases to exist upon amendment and the section, as amended, supersedes it and becomes a part of the statute for all intents and purposes as if the amendment had always been there.*

\* \* \*

The effect of an amendment to a specific section of an act is to *strike the old section from the law,* in the absence of a saving clause, *obliterate it entirely,* and *substitute the new section in its place,* and while provisions carried over are deemed continued rather than repealed and enacted anew, they have their force from the new act and not the old. [*Id.,* pp 527-528. Emphasis added.]

Similarly see the following decisions of this Court: *Kalamazoo City Ed Ass'n v Kalamazoo Public Schools,* 406 Mich 579; 281 NW2d 454 (1979), *Lahti v Fosterling,* 357 Mich 578; 99 NW2d 490 (1959), *Rookledge v Garwood,* 340 Mich 444; 65 NW2d 785 (1954), *Detroit Club v State of Michigan,* 309 Mich 721; 16 NW2d 136 (1944), and *People v Lowell,* 250 Mich 349; 230 NW 202 (1930), and the following decisions of the Court of Appeals: *Morgan v Taylor School Dist,* 187 Mich App 5; 466 NW2d 322 (1991), *Priest v Canada Life Assurance Co,* 179 Mich App 731; 446 NW2d 352 (1989), and *Avon Twp v State Boundary Comm,* 96 Mich App 736; 293 NW2d 691 (1980).

I would hold, on the authority of the cited decisions of this Court, that in 1988, when the city first attempted to levy a service charge respecting this intracounty drain, its power to do so under § 490 was, as set forth in 1979 PA 135, effective March, 1980, *"subject to section 489a."* See part I(C) for text of pertinent language of § 490.

### III

The majority has not justified its assumption that "the Legislature intended that § 489a would have only prospective effect." *Ante,* p 663. The majority so assumes simply because it would not have been possible for Southgate to have complied with § 489a under the circumstance that the drain had been completed before March, 1980, when § 489a and the amendment of § 490, subjecting the authority set forth in § 490 to § 489a, became effective.

The 1979 amendment, adding § 489a and subjecting the authority set forth in § 490 to § 489a, is remedial legislation. As set forth in the House Legislative Analysis, HB 4102, May 14, 1979, intra- and intercounty drains "are necessary for the public health," and such "drain projects generally benefit an entire municipality and are financed through ad valorem assessments at large."

The Legislative Analysis continues that although the Drain Code requires that a hearing be held after a petition for a drain project has been filed, "landowners who are specially assessed claim that they often don't find out about the hearing and don't know they are being assessed until they get their tax bills." And that the "bill would allow property owners to voice their concerns in the early planning stages of a drain project. Many landowners feel that their objections and comments will be considered more seriously before a petition for a drain project is filed and money is spent for engineering plans." The Department of Agriculture suggested that "public health is the obligation of the municipalities and should not be assessed to the individual landowners." *Id.*

Having in mind the evil at which the 1979 amendment was aimed—the levying of special

assessments or service or other charges against individual landowners for a community public health project, generally financed through ad valorem assessments at large, without providing individual landowners an opportunity to be heard before the community decides to finance the project by levying special assessments or service or other charges—there is no more reason to suppose that the Legislature intended prospective effect than retrospective effect.

A decision of this Court that the 1979 amendment has retrospective effect, with the result that the cost of annual maintenance and operation of this public health project will be paid by ad valorem and other taxation of the entire community, is no more unreasonable or unfair to the forty percent who do not live in the drainage district than special assessment, without an opportunity to be heard before a city decides to specially assess or surcharge, is to the sixty percent who own property in the drainage district. Good arguments can be made on both sides of the question.

I would adhere to the rule of construction set forth in *Ballog* and the other cited cases, and hold that it is immaterial that the city was unable, in 1988, to comply with the prerequisites set forth in § 489a to the exercise of the power to establish service charges set forth in § 490. The power to establish service charges, except subject to the strictures set forth in § 489a, ceased to exist in March, 1980, when former § 490 was "obliterated in its entirety,"[14] and the new language took its place.

---

[14] See headnote to *Ballog* quoted in part II.